IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION,

NASHVILLE, . . . . . . . . . DECEMBER TERM, 1884.

## MRS. A. F. LINKS *v.* THE STATE.

1. PRACTICE. *Withdrawing evidence.* The practice of admitting incompetent evidence in the progress of trials, to be subsequently withdrawn, is disapproved, but is not of itself reversible error, unless it can be seen that a party has been injured thereby.

2. SAME. *Evidence. Criminal.* Evidence of other transactions than those charged in the indictment cannot, in general, be received, but where knowledge constitutes an essential ingredient in the guilt this rule is relaxed. In such cases transactions of a like kind with those charged in the indictment may be given.

### FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson county.    MATT. W. ALLEN, J.

T. A. ATCHISON, Jr., QUARLES, THOMA & TURLEY and T. L. DODD for Mrs. Links.

ATTORNEY-GENERAL LEA for the State.

COOKE, J., delivered the opinion of the court.

Mrs. A. F. Links, *alias* Miller, *alias* Myers, has
been convicted of grand larceny, and appealed to this
court. The property alleged to have been stolen was
a diamond ring, the property of E. Wiggers, who was
a jeweler, in Nashville. As is shown by the testi-
mony, the defendant came into the jewelry store of
Wiggers, on the morning of November 1, 1883, be-
tween the hours of ten and eleven o'clock, and asked
to be shown an inexpensive diamond ring. A tray
of that character was shown to her, being placed be-
fore her on the show case. She selected one that
she said suited her, worth about $12 or $14. Said
she wanted it for her niece, named "Mamie," and
directed the name "Mamie" to be engraved in it,
and, without being asked, paid $2, and said she
would return in the afternoon and get it. She then
asked for a more expensive diamond ring, and a tray
containing that class of rings was placed before her
on the show case, beside the tray first shown, at this
time three gentlemen came into the store, to see the
proprietor about a matter of business, and engaged
him in conversation for a short time, during which
his attention was diverted from the defendant and the
diamonds. As soon as these gentlemen left the store,
having remained about five minutes, the defendant
asked to be shown some gentlemen's scarf pins, say-
ing her husband was a druggist and she wished to
present him with a pin. Wiggers then put the two trays
of diamonds in the show case. She then said the

pins did not suit, and left the store. While in the store she gave her name as Mrs. Miller. She never returned for the ring she had directed to be engraved or the $2. Upon examination of these trays soon afterwards, it was found that a diamond ring, worth $85, had been taken from the tray of expensive diamonds, and a ring from the tray of cheap diamonds put in its place, and a stray, *chipped* diamond ring, which did not belong to the store, put in the place or niche from which the cheap diamond ring had been removed.

Upon leaving Wiggers' store, the defendant went to the jewelry store of one Stief, in Nashville, arriving there about eleven o'clock, where she gave her name as Mrs. Myers. She there called for diamond and turquois rings. A tray containing expensive diamond rings was placed before her on the show case. She wanted a ring for about $26. She was shown several rings. She selected an inexpensive diamond and turquois ring, and said she would take it, but wanted it made smaller. She said she wanted it for a niece. The clerk who was waiting on her then went forward to get the ring measured, and turned his back on her, leaving her and the tray of expensive diamonds in front of her on the show case. When the clerk returned to where she was, she had some money lying before her. She paid him, unsolicited, $1.50 on the ring, saying she would send a darkey for it at four o'clock that evening. The clerk then marked the price, $13, on the ring and immediately put the diamond ring tray in the case. She

then left. She was the only person to whom diamonds were shown that day at either store. Late that afternoon it was found that a valuable diamond ring, worth $185, was missing from the tray, and a strange ring, which did not belong to Stief, was there in its place, which was upon the next day fully identified as the $85 diamond ring that had been taken from Wiggers' tray as above stated, and for the larceny of which the defendant is indicted. She never sent for the ring she had ordered changed at Stief's, and upon which she had paid the $1.50, and for which she was to send at four o'clock that evening.

About ten days afterwards she was seen and recognized, as they state, by Stief and the clerk, Brenneke, who were on the lookout for her, in Nashville, upon a sleeping car going north on the Louisville & Nashville Railroad, and upon being approached by Brenneke and reminded that she had failed to call or send for the ring she had engaged, denied being the person referred to, or ever having engaged a ring of him. Said he was mistaken, that she was just passing through from New Orleans, and knew nothing about it.

Shortly thereafter she was arrested in Louisville, Ky., upon a requisition of the Governor. She was at a place called St. Joseph's Hospital, or Infirmary, where her husband, or a man named A. F. Links, who claimed to be her husband, was being treated for a diseased foot. Upon being informed of the charge upon which she was arrested, she denied having been in Nashville; said she had left Louisville

on November 1st, and had gone straight through to New Orleans upon a through ticket, and had made no stop any where, and that she had not stopped in Nashville, only to be carried from one depot to the other in a hack. There were two trunks in the room she and her husband were occupying. These trunks were opened and examined, and in the one which contained ladies' apparel, etc., there was found a pawn-broker's ticket, dated Atlanta, November 2d, 1883, which acknowledged the receipt of a diamond ring from Mrs. A. F. Links, to be expressed to her at Charleston, S. C., upon the receipt of $25. Upon being shown this ticket, and told that it showed that she had not gone straight through to New Orleans, she then admitted that she had not, but said she had got out of money, or needed some money, and had stopped in Atlanta and pawned a ring for $25. Upon being told that the register at the infirmary showed she had left Louisville at half-past two o'clock October 31st, and consequently she could not have left on November 1st. She admitted that she was mistaken, and that she had left Louisville on October 31st. After having been arrested she was requested to show her jewelry. She said it was deposited in a bank in the city. She started with the officers to go to the bank, but, before going very far, she said her jewelry was not in a bank, but in the possession of a certain lady at a hotel. Upon being accompanied to the hotel she inquired for the lady named, and was told that she knew that lady was not boarding at the hotel. She then said the lady was to

45—VOL. 13.

come to the infirmary that evening to take a ride with her, but no such lady came, until half-past four o'clock, when the officer and guard left with her for Nashville.

It was also proved by a witness named Allen, that on November 3, 1883, the defendant came to the jewelry store of his father, in Charleston, S. C., and asked to see diamond rings. She was shown the rings, and selected a small, inexpensive diamond ring, and ordered a name to be put into it, saying she would call for it that afternoon at four o'clock. She said her gold spectacles were bent, and left them to be repaired, saying she would call for them at the same hour. They were smoked glasses, such as she was proven to have worn at the hotel while in Nashville. She never came back for the spectacles, nor did she call for the ring. He saw her again that afternoon on the streets in Charleston. Within a day or two, or it might have been a week, the witness is not certain as to length of time, but thinks it was a short time, they missed a soltaire diamond ring from the tray shown the defendant.

There are many other facts and circumstances of more or less significance that might be mentioned, but it is sufficient to say that the testimony, as to the larceny, by the defendant, of the ring charged in the indictment, is ample to sustain the verdict, and it will not be disturbed, unless for error committed during the progress of the trial, or in the charge of the court. Numerous errors, however, have been assigned, and are very earneslty insisted upon for reversal.

The testimony of Steif as to the loss of his ring, in the place of which the ring in question was found, was objected to by the defendant as tending to show a separate and independent ' felony committed by the defendant from that · charged in the indictment, and for which it was shown another indictment was pending against the defendant, but the testimony as above detailed was admitted over the objections, and defendant excepted. We do not understand, however, the objection to this part of Steif's testimony to be very earnestly pressed. It is sufficient to say that in tracing the ring in question which had been stolen from Wiggers, to the defendant, it was necessary to show all the facts and circumstances as to how it came into Steif's possession, and it is difficult to see how this could be done without disclosing the fact that the ring of Steif in the place of which Wiggers' ring was substituted, had been removed, and was necessary to be done in showing that Wiggers' ring was left in its place by the defendant. The Court gave the jury the proper instruction as to the effect of this testimony, as will be hereafter seen. The same witness, Steif, was permitted, over the objection of the defendant, to testify that the defendant had been in · his store on two different occasions a year or more before the 1st of November, 1883, and after each time that she was there he missed diamond rings. But on cross-examination the witness stated that he could only recognize her as the person that was in the store on those occasions by occurrences that have transpired since, whereupon the court withdrew this testimony en-

tirely from the jury. It is insisted, however, that notwithstanding this withdrawal of the testimony by the courts, the jury having heard it, its effect upon them could not be withdrawn, but the error in admitting it was irreparable to the defendant, and the cause should be reversed and a new trial granted for that reason.

There can be no doubt, we think, but that this testimony, as stated in the bill of exceptions, was incompetent and should not have been heard, as no artifice or device is shown to have been used by the defendant on these occasions, even if she had been identified sufficiently, by which she obtained, or sought to obtain, the opportunity of stealing rings, the same or similar to that resorted to upon the occasion of obtaining the diamond ring in question. The practice of admitting incompetent evidence in the progress of trials, to be subsequently withdrawn, has been often disapproved by this court, and its probable or possible injurious tendencies commented upon, but we are not aware of any case having been reversed for that cause alone; nor unless it can be seen that a party has been injured by it, do we think a reversal should be had for that cause.

We can see no evidences in this record of any such injury having been done the defendant. The testimony of the witness Allen, above recited, was objected to by the defendant as tending to establish a wholly separate and distinct larceny by the defendant from that charged in the indictment, or to cause her to be suspected of a separate and distinct criminal

offense. The testimony admitted over the objection
was, as we have already seen, that on November 3,
1883, she entered the jewelry store of the father of
the witness, in Charleston, and asked to see diamond
rings; was shown rings, and selected a small, inexpen-
sive diamond ring, and ordered a name to be put
into it, saying she would call for it at 4 o'clock that
afternoon; said her gold spectacles were bent, and left
them to be repaired, saying she would call for them
at the same hour. She never came back for either
the spectacle or the ring. A short time thereafter,
or in a few days, a soltaire diamond ring was found
to be missing from the tray of diamonds that had
been shown to her.

The court instructed the jury in regard to this
testimony, as follows: "If, in the introduction of evi-
dence to sustain the indictment, the relation of facts
and circumstances are necessarily involved which show,
or tend to show, that the defendant committed a sep-
arate or independent offense, if it was defendant, and
became connected with the commission of the crime
under investigation so as to be a part thereof, it may
be taken as evidence tending to show the guilt of the
defendant of the latter crime, but when they are not
so connected so as to be a part of the transaction
under trial, they can only be looked to for the pur-
pose of showing the identity of the defendant to show
where the crime has been established in the case
when committed, by artifice and stratagem, the guilty
knowledge of the defendant, and to show a part of a
particular system of committing crime, when the ex-

traneous misconduct is of the same character, and by the same artifice and stratagem as the one under consideration."

The above instruction, we think, is a correct exposition of the law in relation to the testimony in question.

The necessity of enforcing the rule that the evidence must be confined to the point in issue, and that no evidence can be admitted, which does not tend to prove or disprove the issue joined, is stronger in criminal than in civil cases. The facts proven should be strictly relevant to the particular charge, and have no reference to any conduct of the prisoner unconnected with such charge. But this rule has its qualifications, equally as well established as the rule itself, upon principle and authority: *Butt* v. *The State*, 9 Hum., 40; *Defrees* v. *The State*, 3 Heis., 64; *Shaw* v. *State*, 3 Sneed, 87; *Wiley* v. *State*, 3 Cold., 343.

Evidence of other transactions than those charged in the indictment cannot, in general, be received; but where knowledge constitutes an essential ingredient in the guilt this rule is relaxed. In such cases transactions of a like kind with those charged in the indictment may be given in evidence: *Powers* v. *State*, 4 Heis., 272.

Thus, upon an indictment for passing counterfeit money, proof that the defendant knowingly passed other counterfeit money at different times is admissible: 2 Hum., 78. Or upon indictment for receiving stolen goods, knowing them to be stolen, evidence of other like offenses: 3 Heis., 116.

In *Garner* v. *The State,* it was held upon an indictment for forgery, evidence of the passage by the defendant of other similar forged paper was admissible to show the scienter: 5 Lea, 213.

In *Defrees* v. *The State,* 3 Heis., 53, it was held that obtaining property by any fraudulent trick or device was larceny, and that where guilty knowledge is to be proved other acts of the prisoners may be admitted, though they amount to substantive felonies or attempts to commit felonies. That was an indictment for robbery, which consisted in obtaining a watch from the prosecutor by means of a trick called the five-cent trick, which was accomplished by concealing a five-cent piece in a split card, and then wrapping or folding up in it another five-cent piece. This was then dropped, as if by accident, in view of the victim, and picked up and unfolded by an accomplice and the five cents folded in it taken out and the card refolded, and the attention of the party dropping the card called to it, who stated it had a five-cent piece in it. This being disputed or questioned by the other party, he offered to bet that it did contain a five-cent piece, whereupon the victim, having seen a five-cent piece taken out when the party offering to bet was absent, was induced to bet his watch that there was not a five-cent piece in the card, whereupon the defendant tore open the card and exhibited the other five cents, and ran off with the prosecutor's watch.

It was not only held that this was robbery, but that evidence of these parties having perpetrated or

attempted to perpetrate the same *trick* upon other persons at different times, was admissible to show that the scheme by which the possession of the property was obtained was an artifice or stratagem designed to be practiced generally in order to obtain the property of such victims as could be thus cheated. The question under consideration falls ·very clearly within the principle decided in that case.

It is very clear that the pretense of desiring to purchase an inexpensive ring for a present for a relation, and the pretense of making the purchase, and leaving the ring to be engraved or altered, and leaving money as an advance upon the same or something of value behind to be called for later, and manifesting a desire to purchase valuable rings, was a mere stratagem or device contrived by the defendant to afford her an opportunity of obtaining possession of valuable diamonds, rings, etc., and of getting away without being suspected or closely watched, and the evidence was competent to show that in thus obtaining possession of the ring in question, it was intentional and with a purpose to steal it, and was not an accidental exchange of rings by mistake while examining and comparing them, or, in other words, as expressed in the books, to prove the scienter. This applies equally to the evidence of Stief, disposed of upon other grounds. The testimony was properly admitted and the instructions of the court in relation to it substantially correct. It is insisted, however, that although this may be so as to separate independent felonies of like character committed by the same artifice or device,

yet the rule cannot apply to cases where no separate felony has been shown to have been committed, but only such facts shown as tended to raise a *suspicion* that the defendant might have committed another separate felony, and that this was the only effect of Allen's testimony, and hence it was error to admit it. It is a sufficient answer to this to say that the evidence tends very strongly, if not conclusively, to show that a larceny was committed, but if it did not, in the case of *Defrees* v. *The State,* above referred to, it was expressly held that evidence of the commission or *attempt to commit* a like felony by the same artifice or device, was admissible, which disposes of this question. Besides there can be no difference in principle.

It is next insisted that the court erred in charging the jury as to the law of *alibi;* not that the law upon this subject was incorrectly charged, but that, as is insisted, no such defense was made for the prisoner. But she did deny that she was in Nashville on the day the larceny was committed; and then that she was in that city on that day except to pass through from one depot to the other; and denied that she was at the store of either Wiggers or Steif; and these denials were in evidence before the jury; and if that were not so, it is difficult to see how the defendant could be prejudiced thereby. She could not attempt to introduce any proof as to her whereabouts on the day or at the time the larceny was committed, but denied as above stated that she was ever at these jewelers'. Her identity is, however, very fully, and we think conclusively, established as the person who was there and

committed the larceny. This is not like the case of
*Gray* v. *The State* furnished us in manuscript. There
a mule was stolen in Clarksville, and the State
proved by certain witnesses that the prisoner was
seen upon the next day after the larceny was com-
mitted riding the mule in Robertson county, a distance
of twenty or twenty-five miles from Clarksville. The
defendant not only admitted that he *was* in Clarksville
at the time the mule was stolen, but proved by
ten or a dozen witnesses that he was also in Clarks-
ville on the next day, at the time the State's wit-
nesses testified to having seen him riding the mule
in Robertson county. Judge Nicholson, in that case,
said it was not a question of *alibi* at the time the
mule was stolen, but was a conflict of evidence as
to the identity of the person seen riding the mule
on the next day, and the certainty and satisfactory
character of proof to sustain an *alibi* did not apply
to the question presented by that record. That case
has no application, that we can see, to the one now
under consideration.

It is next insisted that the court erred in his
charge to the jury upon the subject of larceny.
The court gave the jury a very full, clear and
minutely correct charge upon the subject of larceny,
in all the phases presented by the evidence in the
cause and the theories of the defense, and which is
admitted by the learned counsel for the defense to
be strictly accurate and correct, and then adds the
following words: "Now, gentlemen, what all this
means, as applied to this case is, that if the

defendant went into Wiggers' store and took out a diamond ring or the ring that may be established and described in the proof, and carried it off, and this was done without the consent or against the will of Wiggers, without any claim or shadow of right to do so, in Davidson county, and he was the owner of the ring, either general or special, *as explained,* and the ring had some value, before the finding of the indictment, she would be guilty of larceny, unless some explanation is made of such conduct in the proof going to show that such conduct was not criminal." It is insisted that as some of the elements necessary to constitute larceny are omitted in this instruction, its effect was to withdraw from the jury the very full and accurate instructions previously given them in the charge. We do not so consider it; but while the instruction objected to was wholly unnecessary, and might have been omitted altogether, its manifest object was to call the attention of the jury to the main leading facts necessary to be established by the proof in order to render the defendant guilty, and the words "as explained," at the bottom of the instruction, evidently refers the jury to the full and accurate instruction as given in the paragraph of the charge immediately preceding, and in view of the evidence and the theory of the defense, the facts to which the court called the attention of the jury could not have been found by them or existed consistent with her innocence. And as full and accurate instructions had been given in the former part of the charge and no request that they

should be repeated in this connection, we do not think this was error.

It is also insisted that it was error to admit testimony as to the contents of the trunk that was opened in the room occupied by the defendant at the time of her arrest, and which contained articles of ladies' wearing apparel, and also ladies' wigs of different colors, as well as some jewelers tools used for removing and inserting diamond sets in rings, etc., and in which the pawn-broker's ticket was also found. It is said that this was not shown to be the defendant's trunk, and for that reason the testimony was improperly admitted. This trunk was in her room— was shown to be about the same size, structure and color of the trunk she had at the depot in Nashville on the day the larceny was committed, it was treated and spoken of as her trunk. She did not disclaim it, but when told that the pawn-broker's ticket had been taken out of it and settled that she had stopped in Atlanta, she assented to it, and explained that she had stopped in that city and pawned a diamond ring for $25. These facts sufficiently establish that the trunk was hers.

We have investigated this record, and the questions raised and argued by defendant's counsel, with as much care as we have been able, and are fully satisfied that it contains no error. The jury have dealt as lightly with the defendant as possible under the law. We have no doubt as to her guilt, and the judgment must be affirmed.

FREEMAN, J., and WILSON Sp. J., dissent.